# Federal Defenders
## OF NEW YORK, INC.

Eastern District
16 Court Street - 3rd Floor, Brooklyn, NY 11241
Tel: (718) 330-1200  Fax: (718) 855-0760

Leonard F. Joy
*Executive Director*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

July 13, 2007

Mr. Brandon Maxon
U.S. Department of Probation
Eastern District of New York
111 Livingston Street, 5th Floor
Brooklyn, NY 11201

> Re:    U.S.A. v. Noureddine Malki, 05-CR-845, 06-CR-216 (ERK)

Dear Mr. Maxon:

Below please find Mr. Malki's response to the Revised Presentence report.

1. Page 8, ¶19: as noted in our response to the original Presentence report, dated March 21, 2006, Mr. Malki was never told by the agents that they were aware he was using a false identity. They asked him who "Noureddine Malki" was, and at that time, Mr. Malki decided to admit his true identity. Mr. Malki was not forced to admit his identity, he believes he could have continued to lie about his identity because he does not believe the agents knew he was Noureddine Malki until he decided to tell them.

2. Page 9, ¶20: Mr. Malki participated in two proffers with the government after his arrest.

3. Page 9, ¶21: The defense has been provided with the forensic analysis of Mr. Malki's laptop computer, no other forensic analysis has been provided.

First, Mr. Malki purchased his laptop computer in March or April 2004, well after September 11, 2001. Upon information and belief, the government is in possession of the receipts from this 2004 computer purchase.

Second, Mr. Malki never visited pro Al-Qaeda websites and never downloaded information from them. All of the websites Mr. Malki visited were public web sites, like CNN, the BBC, or websites carrying television or video from Egypt and other middle-Eastern countries. The images Mr. Malki has saved onto his computer include political cartoons, news broadcasts, and television broadcasts concerning issues relevant to the situation in the middle-East.

4. Page 9, ¶23: Mr. Malki did not lie with respect to his criminal history on his security clearances.

First, Mr. Malki has not been arrested for a felony offense. The three offenses Mr. Malki was allegedly arrested for in Massachusetts are all misdemeanors. Under Massachusetts law, an offense is classified as a felony if it is punishable by death or imprisonment in the state prison. Please see Massachusetts General Laws Annotated (MGLA) 274:1  All other crimes are misdemeanors. While two of the offenses Mr. Malki was allegedly arrested for are subject to imprisonment of up to two and one half years, the imprisonment is only to a jail or house of correction, not the state prison. Please see MGLA 268:32B; 265:13D; and 125:1. Under Massachusetts state law, therefore, these offenses are only misdemeanors.

Although we are investigating further, it is unclear whether Mr. Malki was ever arraigned in court, notified of a future date to appear, or that a bench warrant was ever issued for any alleged failure to appear. We will further notify the probation department with the results of our investigation.

5. Page 10, ¶26: Mr. Malki and Mr. Alston deny ever having such a conversation and have never told anyone that they had such a conversation. Mr. Alston has not been interviewed by the Probation Department and we would like to know the source of this information. Prior to his deployment, Mr. Alston told Mr. Malki that he thought it was foolish to go to a war zone for employment, but Mr. Malki told Mr. Alston that he would be making good money and helping the United States. After Mr. Malki had been injured in Iraq, Mr. Alston again told him it was foolish to return, but Mr. Malki said he wanted to help the people who were the victims of the fighting and work with the United States to rebuild schools and libraries.

Mr. Malki has never told Mr. Alston that he was supportive of Muslim uprisings or sympathetic to anti-coalition forces.

Mr. Malki did tell Mr. Alston that he would only be working in Iraq as an interpreter, not a soldier, and would not be in any danger.

6. Page 11, ¶27: Mr. Malki did not steal any documents from the U.S. Army. He either took them accidentally or was provided with them accidentally.

7. Page 11, ¶¶28-32: Mr. Malki was in no position to steal classified documents from the U.S. Army. Through email, Major Box and Sargent Braun, of the 82nd Airborne, told us how secret information was kept in the "G2" office. First, the office was manned 24 hours a day, seven days a week, and Mr. Malki was never left alone in the office. Second, any work Mr. Malki did in the G2 office on the computer was supervised. The computer had secret and non-secret removable hard drives. The secret hard drive was also password protected and Mr. Malki did not have a password. When Mr. Malki needed to work on the computer, the secret hard drive was removed, the unclassified hard drive was put in, and Mr. Malki was supervised the entire time he was working. If Mr. Malki went onto the internet, he was accessing websites via Google or the BBC, and had no ability to access any classified websites.

Mr. Malki has no information as to how the documents or the "Mission Analysis" came into his possession, but he did not and could not steal this information.  He believes that he may have taken the paper documents by accident when he was leaving the base to be redeployed with another unit. Mr. Malki further believes that the "Mission Analysis" was accidentally downloaded to him with other documents.  When Mr. Malki was working at the Al Taqqadam air base he did not have his own computer and got information via downloads.  He kept these downloads on a thumb stick and would then transfer them to CDS.

Mr. Malki denies that he ever demanded to read classified reports on any topic.  We would like to know the source of this information to be better able to factually refute it.

8.  Page 13, ¶¶33-37: Mr. Malki had no motive to steal classified documents.

First, Mr. Malki does not and never has supported Al-Qaeda and its attacks on the United States or anyone else.  The files found on his hard drive come from CNN, the BBC, British newspaper tabloid and other websites, and television stations from Egypt and the United Arab Emirates.  All of the information he had on his computer was obtained from public sources and is not indicative of support for any wrongful activity and does not provide a motive for Mr. Malki to steal classified documents.

Second, all of Mr. Malki's contacts with Iraqi locals were authorized by the Army.  Mr. Malki worked with the local Sunni sheiks on trucking contracts *for* the U.S. Army. Mr. Malki had no knowledge of any of these sheiks being involved in an anti-coalition activities.

Mr. Malki's "use" of the automobile of a sheik was to accept a ride back to the main part of the army base, rather than walk five miles in the rain.  Mr. Malki was reprimanded for riding in the car, but when he explained the problem, the Army later provided Mr. Malki with a scooter so that he could more easily get around the base.

Mr. Malki did not accept bribes from the sheiks, but did accept cash gifts and watches from these individuals.  Members of the military were also given these gifts, which is customary in that part of the world.  When the military officers told Mr. Malki they would have to return their gifts to the sheikhs, they asked Mr. Malki to explain the return to the sheiks.  The sheiks were very insulted, however, about the return of the gifts.  The gifts were not in any way secret, and many members of the military knew about them.

With respect to the trip to Jordan, Mr. Malki was interested in going into business with the sheiks and another member of the U.S. Military, Lieutenant Colonel David Pfluger, with whom Mr. Malki had worked at the Al Taqqadam base.  Mr. Malki traveled to Jordan to discuss the feasibility of purchasing used refrigerated trucks in the United States and shipping them to Iraq (the trucking company had offices in Iraq and Jordan.)  At the time of the trip, Mr. Malki was home in the United States after a shoulder injury.  He was a contract employee with Titan, and he did not believe he was under contract with Titan at the time of the trip.  Mr. Malki did not

believe, therefore, that he had to report the trip to Titan or anyone else. Lieutenant Colonel Pfluger was aware of the trip, however, because Mr. Malki called him from Jordan.

The incident of a report violation of protocol with "Kifah" was actually a false report made by two army officers. Mr. Malki was approached by these officers and asked to purchase liquor and pornography for them, which were not permitted on base. Mr. Malki refused and the men went to an Iraqi and bought the items. Mr. Malki later learned of the purchase. The men were afraid Mr. Malki would report them, and so they claimed that Mr. Malki was having unauthorized contact with individuals at the base gate. This report was later shown to be untrue, and Mr. Malki then reported the men for their illegal purchases.

Mr. Malki was Kifah's contact for the army. When Mr. Malki left the base, Kifah contacted him, first to inquire after his health because he learned Mr. Malki had returned to the United States with an injury, and then in an effort to reach the U.S. Army personnel he had previously worked with at the base. Kifah thought Mr. Malki was still in contact with those personnel, and Kifah contacted Mr. Malki in his efforts to reach the military personnel.

Mr. Malki did not knowingly have contact with anyone with ties to anti-coalition forces. The telephone numbers from Iraq were of individuals he met while working with the army, the telephone numbers in Jordan were related to his efforts to get into the trucking business, and the numbers in Syria were for Kifah and his family. Kifah and his family fled to Syria after members of the family were kidnapped and killed.

9. Page 14, ¶38: Mr. Malki did not make a false exculpatory statement concerning his possession of classified information. Mr. Malki did not knowingly take any secret information from Iraq to his home in Brooklyn. Once back in Brooklyn, Mr. Malki found that he had taken the information. Mr. Malki felt that he should only return the material to a member of the 82nd Airborne unit that he had worked with in Iraq, but he did not know where they were stationed at the time he found the documents. Mr. Malki did not want to risk losing the information and so left it in his apartment when he returned to Iraq, and decided he would resolve the return of the information to the appropriate authorities at a later date. Mr. Malki never said that anyone authorized him to take the information, he was just trying to explain how he thought he had come into possession of the information.

10. Page 14, ¶39: Mr. Malki deleted his emails and cell phone text messages on a regular basis. Although he did delete emails and texts after his interview in September 2005, he thought that the FBI and DOD would be able to obtain copies of this information from the service providers. We do not believe that these acts amount to knowingly and intentionally obstructing justice.

11. Page 15, ¶40: Mr. Malki did not knowingly lie to the Court about his criminal record or how he obtained the classified documents.

4

As noted above, Mr. Malki does not have a criminal record and the particulars of the incident in Massachusetts are unclear.

During his plea allocution, Mr. Malki did not say that he had been authorized to have the documents, he again was trying to explain that he believes he received the "Mission Analysis" document as part of an authorized download. None of these statements are evidence of obstructive behavior.

Finally, Mr. Malki did not photograph or steal a classified U.S. Army battle map. Mr. Malki did not have a camera at the time the photograph was taken. It was common, however, for soldiers to download copies of photographs they had taken to Mr. Malki. The battle map photographs are part of a series of photographs provided to Mr. Malki of time he and the soldiers had spent in the region. Rather than being evidence of further criminal activity on the part of Mr. Malki, these photographs are further evidence of how Mr. Malki could unknowingly come into possession of classified information.

12. Page 17, ¶47: As noted above, we do not believe that Mr. Malki's behavior amounted to obstruction of justice.

13. Page 18, ¶¶55-60: Mr. Malki should not receive an enhancement for fraudulently obtaining a United States passport. The amendment that added this enhancement was 671, and did not go into effect until November 1, 2004. It should therefore not be applied to Mr. Malki's case, because he obtained his passport on April 26, 2000.

As a result, Mr. Malki's adjusted offense level for Count Three is 8.

14. Page 18, ¶¶61-66: The correct guideline for this offense should be §2M3.3.

Appendix A of the sentencing guidelines refers violations of 18 U.S.C. §793(e) to either guideline §§2M3.2 or 3.3. Application note 2 to guideline §2M3.2 states that if a defendant is convicted under 18 U.S.C. §793(e), §2M3.3 may apply. For guidance as to when §2M3.3 may apply to convictions under 18 U.S.C. §793(e), application note 2 refers the Court to the Commentary to guideline §2M3.3.

Application note 2 of guideline §2M3.3 states that guideline §2M3.2 is to be applied to convictions under §793(e) when a defendant is convicted of wilfully transmitting or communicating intangible information to a person not entitled to receive it with reason to believe that it could be used to the injury of the United States or the advantage of a foreign nation.

The four counts of violating 18 U.S.C. §793(e) against Mr. Malki charge him with "having unauthorized possession of a document related to the national defense . . .knowingly and willfully retained the same and failed to deliver it to the officer and employee of the United States entitled to receive it. There is no allegation in the indictment that Mr. Malki transmitted or

5

communicated the information to a person not entitled to receive it, and Mr. Malki was not convicted of that offense. As a result, the correct guideline to apply to Mr. Malki's convictions is §2M3.3.

Additionally, Mr. Malki did not have a public or private position of trust which was abused in this offense. Nothing about his job in Iraq gave him a position of trust which significantly facilitated his commission of this offense, and no two point adjustment should be made.

Finally, as noted above, there should be no enhancement for obstruction of justice.

Mr. Malki's guidelines for counts one through four should be as follows:

¶61: Base offense level (§2M3.3(a)(2):                   24
¶62: Specific offense characteristics:                   0
¶63: Victim related adjustment:                          0
¶64: Adjustment for role in the offense:                 0
¶65: Adjustment for obstruction of justice:              0
¶66: Adjusted offense level:                             24

15. Page 19, ¶69-76: We believe the multiple count adjustment remains the same, and as noted above, we do not believe that Mr. Malki's behavior amounted to an obstruction of justice and he should receive a two point reduction for acceptance of responsibility.

¶69: Adjusted offense level docket 06-CR-216:            24
¶70: Adjusted offense level docket 05-CR-845:            8
¶71: Total number of units:                              1
¶72: Greater adjusted offense level:                     24
¶73: Increase in offense level:                          0
¶74: Combined adjusted offense level:                    24
¶75: Adjustment for acceptance of responsibility         -2
¶76: Total offense level:                                22

In criminal history category I, this offense level carries a guideline range of imprisonment of 41 to 51 months.

16. Page 20, ¶81-83: As noted above, it is unclear whether Mr. Malki was arraigned in court, notified of any pending court date, or that a warrant was issued for failure to appear for any court date.

17. Page 21, ¶84: The sketches contained in Mr. Malki's diary were used to help in his translation. Mr. Malki used the sketches to explain information both to the military and Iraqis while he was interpreting.

We are unaware of any video footage of the TQ entrance on Mr. Malki's computer. Please identify this video footage by file name so that we may investigate further.

18. Page 21, ¶85: As noted above, Mr. Malki did not photograph this classified map. It was provided to him, accidentally, as part of a download of other photographs from Mr. Malki's time in Najaf. At the time he was stationed in Najaf, he did not have a camera.

19. Page 22, ¶86: Mr. Malki never demanded access to a sensitive intelligence room at the base, the dispute was over the use of a table outside of the room. At the base, the room containing classified information was next to the television room. The television room had a table, and Mr. Malki and several other interpreters asked to use the table to eat a meal. The army soldiers watching TV refused to let Mr. Malki and the other interpreters use the table. Mr. Malki and the other interpreters complained and the Captain resolved the situation by letting Mr. Malki and the other interpreters use the table to eat their meal.

20. Page 25, ¶97: We provided the Probation Department with a copy of a translated letter from Mr. Malki's wife in our letters of January 26, 2006 and March 21, 2006. We enclose a copy of the letter again.

21. Page 25, ¶98: Mr. Malki is not in a general population unit at the MDC but he is no longer in total isolation. Mr. Malki is allowed to speak and interact with other inmates on the unit, and has been permitted telephone calls with friends and family. Mr. Malki is still required to have attorney and family visits in the Special Housing Unit.

22. Page 28, ¶109: Mr. Malki did not tell his family that he was going to work as an interpreter for the military in Iraq because he did not want them to worry about his safety.

Please include this information in any amendment to the Presentence report.

Sincerely,

Mildred M. Whalen
Staff Attorney
(718) 330-1290

enc.

cc:    The Honorable Edward R. Korman
       Assistant U.S. Attorney Jeffrey Knox
       Mr. Noureddine Malki, MDC
       ECF

7